**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| **RMD, LLC,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | )    No.  09-2056-JAR |
| | ) |
| **NITTO AMERICAS, INC., et al.,** | ) |
| | ) |
| **Defendants.** | ) |
| | ) |

**<u>MEMORANDUM AND ORDER</u>**

This case involves the rights and obligations of each of the parties relating to a

Distributorship Agreement entered into between the parties on June 9, 2003.  Plaintiff RMD,

LLC ("RMD") brings this lawsuit against Defendants Nitto Americas, Inc. and Permacel, Inc.

alleging breach of contract, fraudulent inducement, fraudulent/negligent misrepresentation and

fraudulent concealment.[1]  Defendants have filed a counterclaim alleging breach of contract for

non-payment of goods delivered, and have asserted eighteen affirmative defenses.  This matter is

now before the Court on Defendants' Motion for Summary Judgment (Doc. 236) on all of

Plaintiff's claims as well as thirteen of Defendants' affirmative defenses, and Plaintiff's Motion

for Partial Summary Judgment (Doc. 237) on its breach of contract claim.  For the reasons

explained in detail below, the Court grants Defendants' motion with respect to expiration of the

Agreement and denies the  motion with respect to the remaining claims and affirmative defenses,

and denies Plaintiff's motion, as there is a genuine dispute as to material facts precluding

judgment as a matter of law.

---

[1]Plaintiff's Amended Complaint also asserted claims for Declaratory Relief (Count I) and Temporary and Permanent Injunctive Relief (Count II).  Those claims are not included in the Pretrial Order, Doc. 224, however, which controls the subsequent course of the proceedings. Fed. R. Civ. P. 16(e).

## I.      Summary Judgment Standard

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine dispute as to any material fact" and that it is "entitled to a judgment as a matter of law."[2] In applying this standard, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party.[3]  A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim."[4]  An issue of fact is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way."[5]

The moving party initially must show the absence of a genuine issue of material fact and entitlement to judgment as a matter of law.[6]  In attempting to meet this standard, a movant that does not bear the ultimate burden of persuasion at trial need not negate the other party's claim; rather, the movant need simply point out to the court a lack of evidence for the other party on an essential element of that party's claim.[7]

Once the movant has met this initial burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial."[8]  The nonmoving party

---

[2]Fed. R. Civ. P. 56(a).

[3]*Spaulding v. United Transp. Union*, 279 F.3d 901, 904 (10th Cir. 2002).

[4]*Wright ex rel. Trust Co. of Kan. v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231-32 (10th Cir. 2001) (citing *Adler v. Wal-Mart Stores, Inc.,* 144 F.3d 664, 670 (10th Cir. 1998)).

[5]*Adler,* 144 F.3d at 670 (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)).

[6]*Spaulding*, 279 F.3d at 904 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)).

[7]*Adams v. Am. Guar. & Liab. Ins. Co.*, 233 F.3d 1242, 1246 (10th Cir. 2000) (citing *Adler,* 144 F.3d at 671).

[8]*Anderson*, 477 U.S. at 256; *Celotex,* 477 U.S. at 324; *Spaulding,* 279 F.3d at 904 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986)).

may not simply rest upon its pleadings to satisfy its burden.[9]  Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant."[10]  To accomplish this, the facts "must be identified by reference to an affidavit, a deposition transcript, or a specific exhibit incorporated therein."[11]  Rule 56(c)(4) provides that opposing affidavits must be made on personal knowledge and shall set forth such facts as would be admissible in evidence.[12]  The non-moving party cannot avoid summary judgment by repeating conclusory opinions, allegations unsupported by specific facts, or speculation.[13] "  "Where, as here, the parties file cross-motions for summary judgment, we are entitled to assume that no evidence needs to be considered other than that filed by the parties, but summary judgment is nevertheless inappropriate if disputes remain as to material facts."[14]

Finally, summary judgment is not a "disfavored procedural shortcut"; on the contrary, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action."[15]  In responding to a motion for summary judgment, "a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the

---

[9]*Anderson,* 477 U.S. at 256; *accord Eck v. Parke, Davis & Co.,* 256 F.3d 1013, 1017 (10th Cir. 2001).

[10]*Mitchell v. City of Moore, Okla.*, 218 F.3d 1190, 1197-98 (10th Cir. 2000) (quoting *Adler*, 144 F.3d at 671).

[11]*Adams*, 233 F.3d at 1246.

[12]Fed. R. Civ. P. 56(c)(4).

[13]*Id.*; *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1199 (10th Cir. 2006) (citation omitted).

[14]*James Barlow Family Ltd. P'ship v. David M Munson, Inc.*, 132 F.3d 1316, 1319 (10th Cir. 1997) (citation omitted).

[15]*Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).

mere hope that something will turn up at trial."[16]

## II.       Motion to Strike

Before determining the uncontroverted facts in this matter, the Court must address Defendants' request to strike the affidavit of Tim McCarthy, RMD's owner, as raised in their Reply to RMD's Response to Defendants' Motion for Summary Judgment.[17]  The standards for ruling on a motion to strike are well established.  Rule 12(f) of the Federal Rules of Civil Procedure provides that the court may order stricken from any pleading "any redundant, immaterial, impertinent or scandalous matter."[18]  Because striking an entire pleading, or a portion thereof, is a drastic remedy, and because a motion to strike may often be brought as a dilatory tactic, motions to strike under Rule 12(f) are generally disfavored.[19]  The decision to grant a motion to strike lies within the court's sound discretion.[20]  This Court typically declines to strike a response to a motion for summary judgment or a supporting affidavit that does not comply with D. Kan. Rule 56.1 or Rule 56(c), and instead simply disregards those portions of the response or affidavit that do not comply.[21]

Defendants ask the Court to strike and disregard all of McCarthy's Affidavit, arguing that

---

[16]*Conaway v. Smith,* 853 F.2d 789, 794 (10th Cir. 1988).

[17]Doc. 258 at 45-48.

[18]Fed. R. Civ. P. 12(f).

[19]*Thompson v. Jiffy Lube Int'l, Inc.*, No. 05-1203-WEB, 2005 WL 2219325, at *1 (D. Kan. Sept. 13, 2005); *Pencro Assoc., Inc. v. Sprint Corp.*, No. 04-2459-JWL, 2005 WL 950626, at *1 (D. Kan. Apr. 25, 2005);

[20]*Geer v. Cox*, 242 F. Supp. 2d 1009, 1025 (D. Kan. 2003).

[21]*See, e.g., Stevens v. Water Dist. One of Johnson County*, 561 F. Supp. 2d 1224, 1231 (D. Kan. 2008) (citation omitted).

it constitutes a "sham" affidavit or alternatively, is conclusory, inadmissible and self-serving. "[A]n affidavit may not be disregarded [solely] because it conflicts with the affiant's prior sworn statements.  In assessing a conflict under these circumstances, however, courts will disregard a contrary affidavit when they conclude that it constitutes an attempt to create a sham fact issue."[22] In determining whether an affidavit creates a sham issue, the Tenth Circuit has directed district courts to consider whether "(1) the affiant was cross-examined during his earlier testimony; (2) the affiant had access to the pertinent evidence at the time of his earlier testimony or whether the affidavit was based on newly discovered evidence; and (3) the earlier testimony reflects confusion which the affidavit attempts to explain."[23]  The Circuit "explicitly require[s] that a district court first 'determine whether the conflicting affidavit is simply an attempt to create a "sham fact issue" before excluding it from summary judgment consideration.'"[24]  In addition, Fed. R. Civ. P. 56(c)(4) provides that "[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."  "Though an affidavit which fails to meet any of the three requirements is subject to a motion to strike, the [c]ourt may also enforce the rule by disregarding portions of the affidavit it finds insufficient."[25]

---

[22]*The Law Co., Inc. v. Mowhawk Constr. & Supply Co., Inc.*, 577 F.3d 1164, 1169 (10th Cir. 2009) (quoting *Franks v. Nimmo*, 796 F.2d 1230, 1237 (10th Cir. 1986)).

[23]*Id.* (quoting *Ralston v. Smith & Nephew Richards, Inc.*, 275 F.3d 965, 973 (10th Cir. 2001)).

[24]*Id.* (quoting *Durtsche v. Am. Colloid Co.*, 958 F.2d 1007, 1010 n.2 (10th Cir. 1992) (quoting *Franks*, 796 F.2d at 1237)).

[25]*City of Shawnee, Kan. v. Argonaut Ins. Co.*, 546 F. Supp. 2d 1163, 1177 (D. Kan. 2008) (internal quotation and citations omitted).

"Conclusory and self-serving affidavits are not sufficient."[26]

In its response to Defendants' motion, RMD submitted an affidavit of McCarthy avering to the parties' intent regarding the Agreement and Defendants' purported fraudulent inducements.  McCarthy states that he interpreted the Agreement as automatically renewing on an annual basis and that, based on his "review of the records," it appears that Defendants have directly sold Exclusive Product to Dynamic Control, JBC/Thermalsound and Novicon, all of whom sell in the automotive aftermarket.  McCarthy does not substantiate or identify which records he bases his conclusions on.  While Defendants assert that McCarthy's affidavit is a sham, they do not identify which portions of McCarthy's affidavit are inconsistent with his deposition testimony except to argue that his deposition testimony was vague, ambiguous, non-responsive and generally evasive, while his affidavit makes bold and unsupported allegations.  The Court declines to search McCarthy's deposition testimony for contradictory statements and will not strike the affidavit on these grounds.  The Court agrees with Defendants, however, that much of McCarthy's affidavit is conclusory and self-serving and will disregard those portions that do not comply with Rule 56(c)(4).

## III.    Uncontroverted Facts

The following material facts are either uncontroverted or deemed admitted.[27]

---

[26]*Murray v. City of Sapulpa*, 45 F.3d 1417, 1422 (10th Cir. 1995) (quoting *Hall v. Bellmon*, 935 F.2d 1106, 1111 (10th Cir. 1991)).

[27]The Court does not consider facts that the record does not support or are not relevant to the legal issues presented.  Both parties have presented extensive extrinsic evidence to aid in contract interpretation, but the Court does not find it necessary to consider such evidence in resolving the parties' cross-motions for summary judgment on the breach of contract issues.  Moreover, the Court does not consider Defendants' statement of additional facts set forth for the first time in their reply brief, noting that these facts were not set out in response to Plaintiff's motion for partial summary judgment as required.  D. Kan. Rule 56.1(b)(1).

RMD is a distributor of, among other things, adhesive sound absorption and vibration dampening material and tape material marketed for the automotive aftermarket.  Defendants Nitto Americas, Inc. ("Nitto") and Permacel, Inc. ("Permacel") (collectively "Defendants"), design, manufacture and sell certain specialty materials, including but not limited to, adhesive tape products, structural material and sound dampening butyl-based materials.  Defendants sell non-exclusive product to original equipment manufacturers ("OEM"), such as GM, Chrysler and Ford.  On June 9, 2003, the parties entered into a Distributorship Agreement ("the Agreement") in which Defendants appointed RMD the exclusive distributor of certain products ("the Exclusive Products"), in a certain market (the "Exclusive Market") within a certain territory (the "Territory").

The following are key provisions of the Agreement:

Section 1(a) of the Agreement states that RMD will act as "exclusive distributor of the Exclusive Products in the Exclusive Market" and that Defendants "shall not directly or indirectly sell the Exclusive Products in the Territory in the Exclusive Market and shall refer to RMD all inquiries received from customers or potential customers in the Territory regarding the same." Paragraph 1(b) of the Agreement states that Permacel will not "sell or distribute, directly or indirectly, the Exclusive Products to any entity or person (other than RMD) under circumstances where Permacel knows or has reason to believe that such sale will result in a breach of RMD's exclusive rights under this Agreement."  The Exclusive Products are listed in Exhibit A of the Agreement and include Product Code 1432—Butyl Constrained Layer.  The Agreement defines the Exclusive Market to include the "automotive aftermarket, including but not limited to the retail (NAPA, Auto Zone, O'Reilly Auto Parts, Pep Boys,etc.), wholesale, do-it-yourself, body

shop, collision, repair, conversion, antique, mobile audio, dealer accessory, restorer, street rod, race, car club, accessory and service markets."

Section 2, entitled "Term of Agreement," states that

> The initial term of the Agreement shall be a period of five (5) years commencing July 1, 2003.  Unless terminated by either party in accordance with Section 12 hereof, the parties shall meet within six (6) months of the expiration of the original or any renewal term of this Agreement to establish sales goals, Exclusive Products, Territory assignment and such other terms and conditions as the parties shall agree to extend the term of this Agreement.

Section 11 of the Agreement is a nonsolicitation clause:

> Permacel recognizes that (i) RMD has and will spend substantial money, time and effort over the years in developing and solidifying its relationships with its customers; (ii) long-term customer relationships often can be difficult to develop and require a significant investment of time, effort and expense; (iii) RMD is hereby agreeing to enter into this Agreement with Permacel based upon Permacel's assurances and promises not to divert RMD's customers' goodwill.  Accordingly, Permacel agrees that subject to the provisions Section 15 below, during the term of this Agreement and for a period of five (5) years from and after termination, if this Agreement is terminated or not renewed by Permacel for any reason, Permacel will not directly or indirectly, either individually or as a principal, partner, agent, employee, employer, consultant, stockholder, joint venture or investor, or as a director or officer of any corporation or association, or in any other manner or capacity whatsoever, engage in, or assist or have any interest in another business that is engaged in, or will be engaged in, calling on or providing any Products to any customer or active prospective customer of RMD who/which was a customer of RMD at any time during the term of this Agreement, or cause or attempt to cause such a person to divert, terminate, limit, modify or fail to enter into any existing or potential relationship with RMD. . . .  This Section 11 shall survive the expiration or termination of this Agreement.

Section 14 of the Agreement provides for termination:

8

> (a) This Agreement may be terminated (i) by RMD as of the end of the initial five-year period or any extended period by written notice of termination given to Permacel at least six months prior to the end of the applicable period, and (ii) subject to the requirements of Section 13, by Permacel as of the end of the initial five-year period or any extended period by written notice of termination given to RMD at least twelve months prior to the end of the applicable period, but only if RMD has been unable to achieve the "Sales Minimums" as described in Exhibit C attached hereto and made a part hereof.

Brian Brace, Vice President and General Manager of Nitto, testified in his deposition that after the initial term ended on June 30, 2008, the parties tried to work through some type of extension or modification of the Agreement.  When they could not reach mutually agreeable terms, Brace sent a letter to McCarthy dated November 25, 2008, stating:

> Over the past several months, both of our companies have tried to reach a reasonable conclusion concerning our now expired Distributorship Agreement.  It has become obvious that we are at an impasse.  Pursuant to Section 2 of that agreement, we have been attempting to negotiate a term extension beyond June 30, 2008, but have been unable to reach mutual agreement on pricing as well as other material.
>
> Nitto Denko Automotive, Inc. will try to continue to support you and your customers throughout this process.  Based on our latest discussions, we agreed to delay our 4/1/08 price increase notice effective 10/1/08 until December 1, 2008.  Please note that on all shipments after December 1, your new prices are reflected below: [parts and new price]
>
> In addition, Nitto Denko Automotive shows an outstanding balance on RMD's account of $114,450.40.  Since most of these receivables are outstanding by more than 60 days, we will need payment in full by November 30, 2008.  All future orders will be CIA until this outstanding balance is brought current.
>
> Lastly, it is our intention to continue to establish a mutually beneficial partnership in the Automotive Aftermarket. We are open to the idea of developing an Agreement that will more clearly define each others [sic] roles, responsibilities & any areas of conflict resolution.  If it is still your

interest to develop a workable Agreement, let me know & we can continue
discussions.

RMD responded with a letter dated December 8, 2008, titled "Notice of Dispute," sent
pursuant to the Dispute Resolution provision in the Agreement, that set forth in detail RMD's
description of disputed matters, including violations of the Exclusivity Provisions by sales of
Exclusive Product to Design Engineering and dB Accoustical, failure to honor purchase orders,
no effective termination and indefinite continuance of Agreement, Cost Plus pricing model,
effective date of price increases, most favored nations pricing, failure to pay marketing fee, and
overcharges for outstanding accounts receivable.  This was followed by a "Certified Settlement
Demand" dated December 24, 2008.  A settlement was not reached, and RMD filed suit on
January 8, 2009.

After the parties conducted limited discovery, a Preliminary Injunction hearing was held
on August 14, 2009, at which time RMD sought to enjoin both the sale of Exclusive Product to
others as well as the provision requiring Defendants to sell to RMD and requiring RMD to obtain
Exclusive Product exclusively from Defendants.  Defendants did not dispute the validity of the
Agreement, but argued that it was no longer in force and effect as it had expired at the end of the
initial five-year term, without renewal.  Defendants also did not dispute that Exclusive Products
were indirectly sold to RMD competitors, namely Second Skin and Design Engineering.  These
automotive aftermarket retailers were not customers of Defendants, but were down the stream of
commerce and thus indirect sales.  Specifically, Defendants sold to Sundown, which it thought
was in the marine industry, who then sold to the retail store Design Engineering; and to
dBAcoustics, which it thought was in the bus industry, who then sold to Wholesale Banner, who

10

then sold to retailer Second Skin.  After hearing testimony from Tim McCarthy, the Court cut the

hearing short, holding that it was highly unlikely that it would grant the mandatory relief RMD

sought, and that the issue of whether the Agreement terminated/expired was an ultimate issue of

law and the Court was not yet in a position to interpret the contract.  The Court held that

regardless, there was no real dispute that the non-solicitation provision remained in effect and

suggested the parties enter into an agreed order giving notice to buyers/customers of the non-

solicitation requirement, acknowledging that the Court could not control what people do or make

customers comply by not selling product into the secondary automotive market.  Defendants

clarified that they would consent to such a prophylactic order, but that they would not agree to an

admission or finding of a violation of the Agreement or whether it had expired or terminated.

On September 17, 2009, the Court entered the Agreed Order enjoining Permacel from

the direct and indirect sale of the Exclusive Products in the automotive aftermarket.[28]

Specifically, the Order enjoined Defendants from taking any actions inconsistent with the non-

solicitation provisions of the Agreement including "directly or indirectly engaging in, assisting

or having any interest in any business engaged in, calling on or providing any Exclusive

Products, as defined by the Agreement, to RMD's current, former or active prospective

customers in the Automotive Aftermarket."  The Order further required that if "direct or indirect

sales of Exclusive Products are discovered or made known to Defendants . . . Defendants must

disclose such sales to the Court and Plaintiff's counsel in writing within seven (7) days."

Defendants are then required to submit to Plaintiff copies of all documents related to the sales

---

[28]Doc. 52.

"including, but not limited to, any contracts, purchase orders, invoices."[29]  Defendants sent out nearly 100 letters to customers in compliance with the Agreed Order.

In September 2010, RMD moved to enforce the Agreed Order,[30] after it discovered that Permacel sold the Exclusive Product to JBC Technologies, who in turn sold the product under the name ThermalSound Direct.  RMD notified Permacel of the purported violation of the Agreed Order and although Permacel was unable to confirm the violation, it instructed personnel not to accept any more orders from JBC and sent a letter to the Court advising of the perceived violation, per the terms of the Agreed Order.  RMD subsequently withdrew its motion without a hearing.[31]  As an additional cautionary measure, on October 7, 2010, Defendants sent a second letter of notification to customers that followed the previous format.

In March 2011, RMD moved to clarify the Agreed Order, alleging that Defendants had attempted to circumvent the order and their obligations under the Agreement by referring what should be RMD's business to Defendants' affiliates.  Specifically, RMD contended that on February 28, 2011, Anthony Collova, former owner of Second Skin, provided deposition testimony that in 2007 he purchased 1432 BCL—one of the Exclusive Products—from Craig Lakian, an employee of Defendant Permacel.  Collova testified that Lakian and Permacel sold him 1432 BCL for approximately twelve to eighteen months, until Lakian notified him that Permacel could not do further business because RMD filed the instant action.  Collova later contacted Defendant Nitto, but was unaware of its affiliation with Permacel.  Nitto initially told

[29]*Id.*

[30]Doc. 110.

[31]Doc. 128.

Collova that they could not supply him with the product because of the Agreement with RMD, but after he told them how well his business was doing, told Collova that they could circumvent the restrictions related to RMD if Collova purchased the products from one of Nitto's overseas affiliates, presumably Nitto Denko of Japan. Collova testified that this exchange with Nitto occurred approximately twelve to eighteen months after he stopped buying from Lakian and Permacel, and during the effective period of the Agreed Order. Craig Lakian disputes the accuracy and veracity of Collova's testimony and avers that he was duped by Mike Demo at dB Accoustical, who in turn sold to Wholesale Banner and ultimately to Second Skin. Lakian believed that Demo was purchasing product for the commercial bus industry. Demo admitted in his deposition taken in May 2010 that he intentionally deceived Defendants in the ordering of Exclusive Product, claiming it was to be used in the bus market.

The Court found that the additional language proposed by RMD to clarify the Agreed Order to specifically include direct or indirect sales through any affiliate entities of defendants, was unnecessary because such sales are already within the scope and intent of that Order.[32] The Court further found that Defendants understood and are on notice that the referral of RMD's potential customers to Defendants' affiliates would be in violation of the Agreed Order.

RMD does not dispute that it was behind on payments for product delivered. RMD admits that it ceased making purchases from Permacel in March of 2009, and at the time of the preliminary injunction hearing in August 2009, it was not currently purchasing any product from Permacel. As early as April 3, 2008, Tim McCarthy was in contact with Henkel Corporation regarding doing business together and by the end of 2008/beginning of 2009, had secured

---

[32]Doc. 206.

Henkel as an alternate supplier of Exclusive Product.  The parties dispute whether Exhibit 1 to the Amended Complaint, which sets out a "cost-plus pricing model formula," is a true and correct copy of the original Agreement because it includes additional Exhibits and schedules that were not part of the original Agreement.

In April  2011, RMD issued 86 subpoenas duces tecum, seeking business records of 82 of Defendants' customers and four business partners, which Defendants moved to quash.  As of July 18, 2011, when summary judgment motions were filed, approximately fifty of the targets had responded.  Defendants list these customers who responded to the subpoena and provide detail to confirm that they do not sell or resell into the automotive aftermarket.  The parties have since reached an agreement as to the scope of the subpoenas, and discovery deadlines have been extended.[33]

## IV.    Discussion

### A.    Defendants' Motion for Summary Judgment

Defendants move for summary judgment on all of RMD's affirmative claims, including the claims for declaratory and permanent injunctive relief that are not included in the Pretrial Order, as well as thirteen of their affirmative defenses.  Specifically, the affirmative claims include breach of contract, fraudulent inducement, fraudulent misrepresentation, negligent misrepresentation and fraudulent concealment/fraud by silence; the affirmative defenses include prior material breach, failure to perform conditions precedent, statute of frauds, waiver, estoppel, laches, unclean hands, failure to mitigate damages, ambiguity, unconscionability, impossibility,

---

[33]Doc. 269.

reformation, and rescission.  Defendants do not move for summary judgment on their counterclaim for non-payment of goods.

Despite citing 341 facts to support their motion, with the exception of the declaratory judgment analysis, Defendants fail to apply the facts to the specific count and/or affirmative defense in their argument.  Defendants do generally assert that they did not act with knowledge and that RMD cannot show damages, but otherwise provide no analysis nor apply any facts to support the claims or defenses, instead merely reciting the applicable standards or elements. Specifically, in their discussion of Counts IV, V, VI and VII, the fraud claims, Defendants merely set forth the five elements of each claim with a case citation, then conclusively state that RMD has failed to produce evidence of each element.[34]  And, in the discussion of their affirmative defenses, Defendants do not even bother to state that they are entitled to summary judgment, instead merely reciting the applicable standard or elements.  For example, the analysis of statute of frauds merely sets forth the elements found in K.S.A. § 33-106; similarly, the analysis of waiver merely recites a Kansas Pattern Instruction.[35]

The Court declines to sift through the record to find support for Defendants' arguments and construct their arguments for them.  On a motion for summary judgment, the court will not marshal the evidence for a party.[36]  It is the duty of the parties to direct the court to those places

---

[34]Doc. 241 at 95-97.

[35]*Id*. at 98.

[36]*See Cuenca v. Univ. of Kan.*, 101 F. App'x 782, 2004 WL 1328676, at *1 (10th Cir. June 15, 2004).

in the record where evidence exists to support their positions.[37]  "It is not this court's task to comb through [the party's] submissions in an effort to link alleged facts to his arguments or to construct [the party's] arguments for him."[38]  "The court will not sift through the record in an attempt to locate or articulate arguments for [the party's] counsel."[39]  "It is the [party's] responsibility to tie the salient facts, supported by specific record citation, to [his] legal contentions."[40] "The Court is not required to construct arguments for a party and is 'wary of becoming [an] advocate [ ] who comb[s] the record of previously available evidence and make[s] a party's case for it.'"[41] "If the rule were otherwise, the workload of the district courts would be insurmountable and summary judgment would rarely be granted."[42]

As the Tenth Circuit has explained,

> No matter how often they are made to feel the part, our brothers and sisters on the district court bench should not be cast in the role of stage director of the litigation drama—forced to prod the actors through rehearsals until the proper performance is achieved.  To do so would not only consume an inordinate amount of time, but would result in courts abandoning their neutrality and becoming advocates in the adversarial process.  We will not sanction such a

---

[37]*See Caffree v. Lundahl*, 143 F. App'x 102, 106 (10th Cir. 2005); *see also SIL-FLO, Inc. v. SFHC, Inc.*, 917 F.2d 1507, 1513-14 (10th Cir. 1990) (stating that not only will the court not sift through the record to find support for an argument, the court will not manufacture arguments for the party).

[38]*Barcikowski v. Sun Microsystems, Inc.*, 420 F. Supp. 2d 1163, 1179 (D. Colo. 2006).

[39]*Saladin v. Packerware Corp.*, No. 99-4086-DES, 2001 WL 476066, at *5 (D. Kan. May 2, 2001).

[40]*Schaede v. Boeing Co.*, 72 F.3d 138, 1995 WL 736464, at *5 (10th Cir. Dec. 13, 1995) (citing *Gross v. Burggraf Constr. Co.*, 53 F.3d 1531, 1546 (10th Cir. 1995)); *accord United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) ("Judges are not like pigs, hunting for truffles buried in briefs.").

[41]*Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 672 (10th Cir. 1998) (citations omitted).

[42]*Mitchell v. City of Moore*, 218 F.3d 1190, 1199 (10th Cir. 2000) (citing *Adler*, 144 F.3d at 672).

transformation.[43]

Accordingly, the Court denies Defendants' motion with respect to Counts IV, V, VI and VII, as well as the thirteen affirmative defenses. However, because Defendants' analysis of claims couched as falling under RMD's dropped claim for declaratory judgment involves construction of the Agreement and overlaps with RMD's motion for partial summary judgment on its breach of contract claim, Count III, the Court will proceed to discuss those issues in the context of RMD's motion.

### B.      Plaintiff's Motion for Partial Summary Judgment

RMD moves for partial summary judgment on Count III, its breach of contract claim. In response, Defendants ask the Court to determine as a matter of law eight different issues relative to the Agreement: 1) the Agreement has expired; 2) the Agreement does not continue indefinitely; 3) there is no "cost-plus" pricing model or formula in the Agreement; 4) there has been no direct sale in violation of the Agreement; 5) indirect sales require knowledge to constitute a violation of the Agreement; 6) there is no evidence of solicitation in violation of the Agreement; 7) the merger and integration clauses of the Agreement prevent oral agreements; and 8) RMD failed to meet "Sales Minimums" under the Agreement.

The elements for a breach of contract claim under Kansas[44] law are: (1) the existence of a contract between the parties; (2) consideration; (3) the plaintiff's performance or willingness to perform in compliance with the contract; (4) defendant's breach of the contract; and (5) that

---

[43]*Id.* at 1199.

[44]Section 18(h) of the Agreement states that it shall be governed by the laws of the United States and the State of Kansas "without regard to the laws of such jurisdictions concerning conflict of laws."

plaintiff suffered damage caused by the breach.[45]  The Court discusses each element in turn.

### 1.      Existence of Contract

RMD contends that neither party disputes the existence of the Agreement and the enforceability of the non-solicitation clause.  Defendants counter that while they do not dispute the validity of the Agreement, it expired without renewal at the end of the initial five-year term. Defendants do not dispute the enforceability of the non-solicitation clause, which survives expiration of the Agreement.  Defendants further argue that there is no "cost-plus" pricing model or formula read into the Agreement.

#### *Termination/Expiration of Agreement*

Defendants argue that the Agreement expired at the end of the initial five-year term, without renewal.  Although the Agreement provides for the possibility of an extension upon successful negotiation of mutually agreeable terms, Defendants argue that the parties had not agreed to such terms and thus the Agreement expired.  RMD asserts that the Agreement has not expired, but continues indefinitely because Defendants did not exercise their option of termination under paragraph 14 of the Agreement.

The construction of a written contract is a question of law.[46]  Generally, if the language in a written contract "is clear and can be carried out as written, there is no room for rules of construction."[47]  "'In considering a contract which is unambiguous and whose language is not

---

[45]*See, e.g.*, *Britvic Soft Drinks, Ltd. v. ACSIS Techs., Inc.*, 265 F. Supp. 2d 1179, 1187 (D. Kan. 2003).

[46]*See, e.g.*, *Ponds ex rel. Poole v. Hertz Corp.*, 158 P.3d 369, 372 (Kan. Ct. App. 2007).

[47]*Gore v. Beren*, 867 P.2d 330, 336 (Kan. 1994) (quotation omitted).

doubtful or obscure, words used therein are to be given their plain, general and common meaning, and a contract of this character is to be enforced according to its terms.'"[48]  The cardinal rule of contract interpretation is that the court must ascertain the parties' intention and give effect to that intention when legal principles so allow.[49]  Where a contract is complete and unambiguous on its face, the court must determine the intent of the parties from the four corners of the document, without regard to extrinsic or parol evidence.[50]  The provisions of a written contract must be interpreted as a whole and in harmony rather than in isolation.[51]

Whether a contract is ambiguous is also a question of law for the court.[52]  "Ambiguity in a written contract does not appear until the application of pertinent rules of interpretation to the face of the instrument leaves it generally uncertain which one of two or more meanings is the proper meaning."[53]  "The court must not consider the disputed provision in isolation, but must instead construe the term in light of the contract as a whole, such that if construction of the contract in its entirety removes any perceived ambiguity, no ambiguity exists."[54]  To be ambiguous, a contract must contain provisions or language of doubtful or conflicting meaning, as

---

[48]*Wagnon v. Slawson Exploration Co.*, 874 P.2d 659, 666 (Kan. 1994) (quoting *Barnett v. Oliver*, 672 P.2d 1228, 1238 (Kan. Ct. App. 1993)) (internal quotation omitted).

[49]*Kay-Cee Enter., Inc. v. Amoco Oil Co.*, 45 F. Supp. 2d 840, 843 (D. Kan. 1999) (citing *Hollenbeck v. Household Bank*, 829 P.2d 903, 903–06 (Kan. 1992)).

[50]*Id.* (citing *Simon v. Nat'l Farmers Org., Inc.*, 829 P.2d 884, 887–88 (Kan. 1992)).

[51]*Decatur Cnty. Feed Yard, Inc. v. Fahey*, 974 P.2d 569, 574 (Kan. 1999) (citations omitted).

[52]*Simon*, 829 P.2d at 888.

[53]*Id.* (citing *Farm Bureau Mut. Ins. Co. v. Old Hickory Cas. Ins. Co.*, 810 P.2d 283, 284 (Kan. 1991).

[54]*Kay-Cee Enter.*, 45 F. Supp. 2d at 843 (citing *Arnold v. S.J.L. of Kan. Corp.*, 749 P.2d 64 (Kan. 1991)).

gleaned from a natural and reasonable interpretation of its language."[55]  Any ambiguity in a

contract will be construed against the drafter.[56]  But where an ambiguous contract is prepared

jointly and equally by the parties, it will not be liberally or strictly construed against either

party.[57]  The Court is to use common sense and not strain to create an ambiguity in a written

instrument when one does not exist.[58]  The fact that the parties do not agree over the meaning of

terms does not in and of itself prove that the contract is ambiguous.[59]  Nor is a contract

ambiguous merely because it does not address an issue.[60]

"In construing an ambiguous . . . contract, the court may take into consideration the

interpretation placed upon the contract by the parties themselves.  If the parties have by their

conduct placed an interpretation on an ambiguous contract, it will be followed by the court."[61]

"Accordingly, the Court looks to the subsequent conduct of the parties—their practical

construction of terms of the contract."[62]  "If parties to a contract, subsequent to its execution,

have shown by their conduct that they have placed a common interpretation on the contract, this

---

[55]*Gore v. Beren*, 867 P.2d 330, 336 (Kan. 1994) (quotation omitted).

[56]*Liggatt v. Emp'rs Mut. Cas. Co.*, 46 P.3d 1120, 1126 (Kan. 2002).

[57]*Colburn v. Parker & Parsley Dev. Co.*, 842 P.2d 321, 328 (Kan. Ct. App. 1992) (quoting *Crestview Bowl, Inc. v. Womer Contr. Co.*, 592 P.2d 74 (1979)).

[58]*Eggleston v. State Farm Mut. Auto. Ins. Co.*, 906 P.2d 661, 662 (Kan. Ct. App. 1996), *rev. denied*, 261 Kan. 1086 (1997).

[59]*Ryco Packaging Corp. v. Chapelle Int'l, Ltd.*, 926 P.2d 669, 674 (Kan. Ct. App. 1996), *rev. denied*, 261 Kan. 1086 (1997).

[60]*TMG Life Ins. Co. v. Ashner*, 898 P.2d 1145, 1154 (Kan. Ct. App. 1995).

[61]*First Nat'l Bank of Olathe v. Clark*, 602 P.2d 1299, 1304 (Kan. 1979) (citation omitted).

[62]*Fisherman Surgical Instr., LLC v. Tri-Anim Health Servs., Inc.*, 502 F. Supp. 2d 1170, 1179 (D. Kan. 2007) (citing *City of Wichita, Kan. v. Southwestern Bell Tel. Co.*, 24 F. 3d 1282, 1287 (10th Cir. 1994)).

20

interpretation will be given great weight."[63]

When a contract is not ambiguous, the court may not rewrite a contract to achieve an equitable result under the guise of contract construction.[64]  Unless a contrary intent is demonstrated, contracting parties are presumed to have in mind all existing and applicable statutes and case law relating to the contract.[65]

Under the ordinary operation of the Agreement, the primary "initial term" was for five years.  Thereafter, absent termination, the parties were to meet within six months "of the expiration of the original or any renewal term" to negotiate a mutually agreeable extension of the initial term of the Agreement.  RMD maintains that because there was no letter of termination issued by Defendants pursuant to section 14(a) of the Agreement, it remains in effect indefinitely.  Defendants, on the other hand, contend that the Agreement expired automatically at the end of the five-year initial term without renewal or extension.  It is uncontroverted that Defendants did not terminate the agreement, and the parties did not negotiate an additional term.  And, although Defendants generally urge the Court to construe the initial term provision against RMD, as the purported drafter, neither party argues that the Agreement is ambiguous.  Thus, the issue before the Court is what happens at the end of the initial term if neither party terminates the Agreement and the parties were not in agreement as to the terms of any extension of the Agreement.

---

[63]*Id.* (citing cases).

[64]*See Quenzer v. Quenzer*, 587 P.2d 880, 882 (Kan. 1978); *see also Patrons Mut. Ins. Ass'n v. Harmon*, 732 P.2d 741, 746 (Kan. 1987).

[65]*See Anderson v. Nat'l Carriers, Inc.*, 727 P.2d 899, 903 (1986); *Steele v. Latimer*, 521 P.2d 304, 310 (Kan. 1974).

RMD's proposed interpretation is consistent with a standard "evergreen" provision, which allows a contract to automatically renew for another term, typically a year, without further action by the parties.[66]  "'Evergreen clauses'" provide that the term of the contract will be extended for some specified period beginning with the date of expiration of the primary term. The contract would remain in effect until terminated by action of one of the parties after giving the required notice prior to the anniversary date."[67]  While a so-called evergreen contract typically extends for an additional set term if not otherwise terminated, "it does not fall that all such contracts terminate in such fashion."[68]  Instead, the issue turns, as it must, on the specific contract language employed in each case.[69]

RMD maintains that if the Agreement is read to expire automatically after the initial five-year term, the termination provision in paragraph 14 that requires notice of termination "as of the end of the initial five-year period or any extended period by written notice of termination given to RMD at least twelve months prior to the applicable period" is meaningless.  But expiration and termination are neither interchangeable nor incompatible, and both are referenced throughout the Agreement.  In addition to the initial term provision, section 11, the non-solicitation provision shall "survive the expiration or termination of this Agreement," and applies "if this Agreement is terminated or not renewed by Permacel for any reason."  Section 14, the

---

[66] *See, e.g., Vulcan Materials Co. v. Atofina Chems. Inc.*, 355 F. Supp. 2d 1214, 1240 (D. Kan. 2005) (evergreen contract provided after initial term is "shall renew automatically for successive twelve (12) calendar month periods" unless the contract is terminated); *Zurn Constructors v. B.F. Goodrich Co.,* 685 F. Supp. 1172, 1174-75 (D. Kan. 1988) (evergreen contract provided it will be in effect for a primary period of one year and thereafter, on a year-to-year basis, subject to timely termination by either party).

[67] *Id.* (quoting *Superior Oil Co. v. Pioneer Corp.*, 532 F. Supp. 731, 733 (N.D. Tex. 1982)).

[68] *Id.* at 1241.

[69] *Id.* (citations omitted).

termination provision, states that RMD may terminate the Agreement for cause at the end of the initial five-year period "or any extended period."

Moreover, RMD's position requires the Court to ignore the express language of the Agreement, which does not provide for automatic renewal for a definite term, but rather, requires the parties to meet and negotiate any such terms for renewal.  A contract that specifies the period of its duration generally terminates on the expiration of such period.[70]  Thus, if no agreement is reached, there is no renewal.  If this result is contrary to RMD's original intentions, the Agreement is simply not well drafted.  The parties may well have intended the result contemplated by RMD—that the Agreement automatically renews in the absence of notice to terminate.  However, "[t]he function of the court is to enforce a contract as it is actually written by the parties, not to create one based upon what the contracting parties wisely should have done."[71]

Thus, based on the entire Agreement, the Court finds that the Agreement expired without renewal after the initial term ended on June 30, 2008.  The Court's conclusion is consistent with the principle that Kansas contract law disfavors contractual rights and obligations between parties unbounded by definite limitations of time.[72]  Defendants are granted summary judgment

---

[70]*All West Pet Supply Co. v. Hill's Pet Prods. Div., Colgate-Palmolive Co.*, 840 F.Supp. 1433, 1439-1440 (D.Kan.1993) (citing *Bartlett & Co., Grain v. Curry,* 563 P.2d 1096, 1101 (Kan. Ct. App. 1977)).

[71]*Vulcan Materials*, 355 F. Supp. 2d at 1243 (citing *NEA-Coffeyville v. Unified Sch. Dist. No. 445*, 996 P.2d 821 [404] (Kan. 2000)).

[72]*All West Pet Supply Co.*, 840 F.Supp. at 1439-1440 (citing *Augusta Med. Complex, Inc. v. Blue Cross of Kan., Inc.,* 608 P.2d 890, 895 (Kan. 1980)).

on this issue.[73]

### *"Cost-plus" Pricing Model*

Defendants contend that while the Agreement does establish an agreed-upon preliminary price, it does not provide for any particular "pricing model," and ask the Court to find as a matter of law that the merger and integration clauses of the Agreement prevent Plaintiff's reference to purported oral agreements and representations not found in the language of the Agreement. While RMD does not move for summary judgment on the issue of the "cost-plus" pricing model, it nevertheless argues that it agreed to purchase the Exclusive Products directly from Defendants under an agreed-upon pricing model for the duration of the Agreement, and that this so-called "cost-plus" pricing model is fixed in the Agreement. Further, RMD is not suing on any alleged oral agreement, and bases its claim on Paragraph 3 of the Agreement, which states that "the terms of sale of Products by Permacel to RMD shall be in accordance with the contractual prices listed on Exhibit B." RMD submits a copy of Exhibit B that includes the cost-plus pricing model; Defendants assert that RMD's exhibit is not a true and correct copy and submit a copy of what they purport to be an original of the Agreement. Clearly, this constitutes a material issue of fact precluding summary judgment.

### 2.      Consideration

Defendants do not dispute that the Agreement was supported by valid consideration, but go on to qualify their admission by referencing generally the affirmative defenses raised in their separate motion for summary judgment. As set forth above, however, Defendants fail to provide

---

[73]The expiration date of the Agreement will impact RMD's claim for damages, and will be addressed separately in an Order ruling on the parties' respective *Daubert* motions.

analysis of these defenses and the Court declines to marshal the evidence or make Defendants' arguments for them.

### 3.    Willingness to Perform

Kansas law has long recognized that a claimant must demonstrate his or her own performance or willingness to perform under a contract to present a viable claim for breach of contract.[74] RMD asserts that it has performed and is willing to perform its obligations under the Agreement.  The Court has ruled, however, that the Agreement expired without renewal after the initial five-year term, rendering this issue moot with respect to all but the non-solicitation clause of the Agreement, which RMD has demonstrated it is willing to perform, per the terms of the Agreed Order.

### 4.    Breach

RMD bases most of its arguments in support of Defendants' alleged breach of the Agreement on the evidence presented at the preliminary injunction hearing as well as statements and rulings of the Court, going so far as to state this Court stated at the hearing that there was undisputed evidence that there had been violations of the non-solicitation clause, despite Defendants' specific reservation of this issue.  Although RMD states that the designated corporate representatives of Defendants have "admitted in depositions that there have been multiple breaches of the Agreement through sales of the Exclusive Products into the Exclusive Market," the only specifics it offers are the sales to Sundown and dB Acoustics, as set out at the preliminary injunction hearing, and the attempted circumvention of the Agreement with Collova/Second Skin.  RMD further asserts that prior to the Agreed Order, Defendants did not

---

[74]*Commercial Credit Corp. v. Harris*, 510 P.2d 1322, 1325 (Kan. 1973).

have any mechanism in place to monitor sales of the Exclusive Product. While Defendants acknowledge that the end result was that some Exclusive Products ended up in the automotive aftermarket, they maintain that they did not sell the product directly, nor have they sold the product indirectly with knowledge that the product would end up in the automotive aftermarket. Further, Craig Lakian has disputed Collova's account of the alleged attempted circumvention of the Agreement. Defendants also ask the Court to determine as a matter of law that there has been no direct sale in violation of the Agreement, that indirect sales require knowledge of Defendants in order to constitute a violation of the Agreement, and that there is no evidence of solicitation in violation of the Agreement.

RMD has presented evidence that Exclusive Product ended up in the automotive aftermarket both during the initial term of the Agreement and thereafter. There is also evidence in the record that Defendants knew or should have known the product would end up in the automotive aftermarket or, at least, did not take steps to ensure that the product did not end up in the hands of competing retailers and distributors. And, there is evidence of an attempted circumvention of the Agreement with Collova. All of these material facts are vigorously disputed by Defendants, who are correct that their statement that some Exclusive Product ended up in the automotive aftermarket is not a statement of admission or an acknowledgment that the contract was breached and that the Court did not so rule at the preliminary injunction hearing. Clearly, the parties have a fundamental disagreement about what is required under the Agreement and how the Exclusive Product ended up in the aftermarket. These facts are so dramatically in dispute that both parties' request for summary judgment is denied.

### 5.      Damages

Finally, RMD asserts that it has suffered damages in significant sales volume reduction in the Southern California, Arizona, New Mexico and Western Texas markets that correlates to the time periods of Exclusive Product being delivered to competitors.  Plaintiff's expert Mark Vianello, a CPA, prepared a report calculating RMD's lost profits damages totaling over $2.6 million.  These damages are broken down into: 1) sales infringement by Sundown and dB Acoustical; 2) lack of most favored nation pricing; 3) historical diminished sales volumes in the amount of; 4) present value of future diminished sales volumes through 2080 (70 years); 5) obsolescence of packaging; 6) minus Permacel's accounts receivable balance.  Defendants have moved to strike portions of Vianello's expert report, specifically all damages that he claims as a result of his projections of future lost profits using the Holt-Winters Exponential Smoothing Forecasting Method or any other statistical or econometric forecasting method, on the grounds that he is not qualified to render such an opinion.[75]  Regardless of how the Court rules on the pending *Daubert* motion, Defendants have not objected to Vianello's opinion that RMD suffered over $200,000 loss from actual sales of Exclusive Product in the Exclusive Market, and Vianello did not use any statistical or econometric calculations in arriving at this damage figure.[76]  Thus, there is a material issue of fact that RMD has suffered damages as a result of Defendants' purported breach of the Agreement, and summary judgment is denied.

**IT IS THEREFORE ORDERED BY THE COURT** that Defendants' Motion for Summary Judgment (Doc. 236) is GRANTED in part with respect to expiration of the

---

[75]Doc. 234.

[76]Doc. 235 at 2-3.

Distribution Agreement, and DENIED with respect to the remaining claims and affirmative

defenses;

**IT IS FURTHER ORDERED BY THE COURT** that Plaintiff's Motion for Partial

Summary Judgment on its breach of contract claim (Doc. 237) is DENIED.

**IT IS SO ORDERED.**

Dated: March 27, 2012

S/ Julie A. Robinson
JULIE A. ROBINSON
UNITED STATES DISTRICT JUDGE
