## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| RMD, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No.  09-2056-JAR-DJW |
| | ) | |
| NITTO AMERICAS, INC., et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## MEMORANDUM AND ORDER

Before the Court are the parties' motions to exclude certain expert testimony and reports:

1) Defendants' Motion to Strike Plaintiff's Expert Marc Vianello (Doc. 318); (2) Defendants'

Motion to Strike and Exclude the "Supplemental" Report of Plaintiff's Expert Witness (Doc.

320);[1] and 3) Plaintiff's Motion to Strike and Exclude the Testimony and Opinions of Dr.

Christopher Pflaum and Dr. George McCollister (Doc 326).  The Court held a hearing on

September 5, 2012, at which time it heard arguments from counsel.  After carefully considering

the submissions and statements of the parties, the Court is prepared to rule.  For the reasons

explained in detail below, both parties' motions are granted in part, and denied in part.

## I.      Background

This case involves the rights and obligations of each of the parties relating to a

Distributorship Agreement ("the Agreement") entered into between the parties on June 9, 2003.

---

[1]Consistent with the history and tone of these proceedings, Plaintiff moves to strike Defendants' motions as exceeding the page limit by one page and not complying with the local rules because they filed two separate objections to Vianello's report and supplemental report (Doc. 343);  Defendants respond with a Motion for leave to exceed the page limit (Doc. 353).  The Court finds the parties' tactics a waste of judicial resources, especially on the eve of trial, and hopes that going forward, the parties will put their gamesmanship aside and focus on the issues at hand.  That said, Plaintiff's motion is denied and Defendants' motion is granted.

Plaintiff RMD, LLC ("RMD" or "Plaintiff") brings this lawsuit against Defendants Nitto Americas, Inc. and Permacel, Inc. ("Defendants") alleging breach of contract, fraudulent inducement, fraudulent/negligent misrepresentation and fraudulent concealment.  Defendants have filed a counterclaim alleging breach of contract for non-payment of goods delivered, and have asserted eighteen affirmative defenses.

On March 27, 2012, the Court denied in part Defendants' Motion for Summary Judgment on all of Plaintiff's claims, granted Defendants' motion with respect to the issue of expiration of the Agreement and denied with respect to all remaining claims and affirmative defenses.[2]  The Court also denied Plaintiff's Motion for Partial Summary Judgment with respect to Plaintiff's breach of contract claim.  The Court rejected Plaintiff's argument that the evidence at the preliminary injunction hearing as well as statements and rulings of the Court established Defendants breached the Agreement, explaining that Defendants' acknowledgment that some Exclusive Product ended up in the automotive aftermarket was not a statement of admission or acknowledgment that the Agreement was breached and the Court did not so rule at the preliminary injunction hearing.[3]  Likewise, the Court rejected Defendants' request that the Court determine as a matter of law that there had been no direct sale in violation of the Exclusivity Provision of the Agreement, that direct sales require knowledge of Defendants, and that there is no evidence of solicitation in violation of the Agreement, explaining that Plaintiff has presented evidence that Exclusive Product ended up in the automotive aftermarket both during the initial term of the Agreement and thereafter, that Defendants knew or should have known the product

---

[2]Doc. 278.

[3]*Id*. at 26-27.

2

would end up in the automotive aftermarket, or at least, did not take steps to ensure that the product did not end up in the hands of competing retailers and distributors, and that there was an attempted circumvention of the Agreement.[4]  The Court emphasized that these material facts were vigorously disputed by Defendants, and that the parties clearly have a fundamental disagreement about what is required under the Agreement and how the product ended up in the aftermarket.[5]

As the Court's ruling on expiration of the Agreement potentially impacted Plaintiff's claim for damages, it also denied the parties' pending *Daubert* motions without prejudice to renew or supplement by the June 15, 2012 deadline set out in the Amended Scheduling Order.[6] Specifically, in reaching his opinion related to the projection of future lost profits, Plaintiff's expert, Marc Vianello, assumes that RMD has not terminated the Agreement and the Agreement remains viable into the indefinite future.  These projected future lost profits are forecast over a seventy (70) year period and total more than $2.4 million.  The Court noted that Defendants' motion challenging the admissibility of Plaintiff's expert testimony focused on the reliability of Vianello; if the Court's summary judgment ruling impacts the relevance of his testimony, it would also impact the rebuttal witness opinions as well as Vianello's supplemental report.  Accordingly, in the interest of judicial economy, the Court denied the pending motions regarding expert testimony without prejudice to renew and  supplement to address the impact of the Court's ruling that the Agreement expired without renewal on June 30, 2008.

---

[4]*Id.*

[5]*Id.*

[6]Doc. 279.

None of the expert reports were subsequently amended or supplemented.  The parties timely renewed all three motions.

## II.      Standard

The Court incorporates the factual background set forth in its summary judgment order (Doc. 278) to the extent it is relevant to the instant motions.  The Court has broad discretion in deciding whether to admit expert testimony.[7]  Fed. R. Evid. 702 provides that a witness who is qualified by knowledge, skill, experience, training or education may testify in the form of opinion or otherwise as to scientific, technical or other specialized knowledge if such testimony will assist the trier of fact to understand the evidence or to determine a fact in issue, "if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case."[8]

The proponent of expert testimony must show "a grounding in the methods and procedures of science which must be based on actual knowledge and not subjective belief or unaccepted speculation."[9]  In order to determine whether an expert opinion is admissible, the Court performs a two-step analysis.  "[A] district court must [first] determine if the expert's proffered testimony . . . has 'a reliable basis in the knowledge and experience of his discipline.'"[10]  Second, the district court must further inquire into whether the proposed

---

[7]*Kieffer v. Weston Land, Inc.*, 90 F.3d 1496, 1499 (10th Cir. 1996) (citation omitted).

[8]Fed. R. Evid. 702.

[9]*Mitchell v. Gencorp Inc.*, 165 F.3d 778, 780 (10th Cir. 1999).

[10]*Norris v. Baxter Healthcare Corp.*, 397 F.3d 878, 884 (10th Cir. 2005) (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592 (1993)).

testimony is sufficiently "relevant to the task at hand."[11]   An expert opinion "must be based on facts which enable [him] to express a reasonably accurate conclusion as opposed to conjecture or speculation . . . absolute certainty is not required."[12]   And it is not necessary to prove that the expert is "indisputably correct," but only that the "method employed by the expert in reaching the conclusion is scientifically sound and that the opinion is based on facts which satisfy Rule 702's reliability requirements."[13]

*Daubert* sets forth a non-exhaustive list of four factors that the trial court may consider when conducting its inquiry under Rule 702: (1) whether the theory used can be and has been tested; (2) whether it has been subjected to peer review and publication; (3) the known or potential rate of error; and (4) general acceptance in the scientific community.[14]   But "the gatekeeping inquiry must be tied to the facts of a particular case."[15]

It is within the discretion of the trial court to determine how to perform its gatekeeping function under *Daubert*.[16]   The most common method for fulfilling this function is a *Daubert* hearing, although such a process is not specifically mandated.[17]   In this case, the parties requested and were granted a hearing on these motions, where they opted to limit their presentation to oral argument; no witnesses testified, nor was any evidence admitted.  The Court

---

[11]*Id*. (quoting *Daubert*, 509 U.S. at 597).

[12]*Dodge v. Cotter Corp.*, 328 F.3d 1212, 1222 (10th Cir. 2003).

[13]*Id*.

[14]*Daubert*, 509 U.S. at 593–94.

[15]*Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999) (internal quotations omitted).

[16]*Goebel v. Denver & Rio Grande W. R.R.*, 215 F.3d 1083, 1087 (10th Cir. 2000).

[17]*Id*.

has carefully reviewed the exhibits filed with the motions and believes this review is sufficient to render a decision.

## III.    Discussion

Defendants raise several challenges to the admissibility of Vianello's initial expert report. Specifically, Defendants contend that Vianello's report is inadmissible on the grounds that 1) it is not consistent with the Court's Order concluding that the Agreement expired June 30, 2008; 2) it is unreliable because it is based on invalid assumptions; 3) his methodology is flawed because he assumes causation; 4) he is not qualified to render an opinion on lost profits using the unreliable Crystal Ball and Holt-Winter statistical computer program; and 5) his opinions rely in part on opinions that are inadmissible hearsay.  Defendants also move to strike Vianello's supplemental opinion as an improper rebuttal.  Plaintiffs move to strike Defendants' rebuttal report on the grounds that the report is an improper rebuttal, the experts' opinions regarding the statistical significance of Plaintiff's damages do not assist the trier of fact and because neither expert is qualified to proffer an accounting methodology or opinion. The Court addresses each objection, although not necessarily in the order set out by the parties, as the arguments are intertwined and overlap.

### A.    Marc Vianello

Plaintiff's damages expert submitted his initial report on July 26, 2010.[18]  Vianello is a Certified Public Accountant ("CPA") licensed in the States of Kansas, Missouri and Iowa.  He has been a CPA since 1977.  The American Institute of Certified Public Accountants has accredited him in business valuation (his ABV credential) and has certified him in financial

---

[18]Doc. 319, Ex. 1.

forensics (his CFF credential).  Vianello is the managing member of an accounting firm.  He has

testified as an expert witness with regard to business valuation and damages in other federal and

state court matters.

Vianello opines that  RMD has suffered damages totaling $2,690,122.00 as a result of

Defendants' breach of the Agreement, broken down into six categories:

| | | | |
|---|---|---|---|
| 1) 2004-2009 Sales infringement: | $ | 216,651.00 | |
| 2) Lack of Most Favored Nation Pricing: | $ | 84,754.00 | |
| 3) Historical diminished sales volumes 2008-2010 | | | $ 260,681.00 |
| 4) Present value of future diminished sales 2010- 2080 | $ | 2,226,621.00 | |
| 5) Obsolescence of packaging: | $ | 15,865.00 | |
| 6) Accounts receivable balance: | | (114,450.00) | |
| | **$** | **2,690,122.00** | |

Category one is Vianello's calculation of damages attributable to Defendants' sale of

Exclusive Product to "the infringers," Soundown from 2004 to 2009, and dB Acoustical from

2007 to 2008.  Category two is the calculation attributable to Plaintiff not receiving the most

competitive prices under Most Favored Nation prices in 2007 and 2008, and compares the

various products purchased by Plaintiff to the prices charged by Defendants for products

purchased by Soundown and dB Acoustical.  Vianello also opined that Plaintiff experienced a

diminished volume of historical sales beyond the sales lost directly to Soundown and dB

Acoustical and  more likely than not, will experience diminished future sales growth.  He

attributes these diminished sales volumes to the requirements that Plaintiff prepay its purchases

of Exclusive Products and the sales growth that would have come by adding the infringer's

customers to Plaintiff's customer base.  Category three forecasts Plaintiff's historical diminished

sales volumes and category four reduces Plaintiff's future diminished sales growth damages to

present value.  Category five calculates Plaintiff's damages incurred by the obsolescence of the packaging used for Exclusive Products.  Finally, category six is the accounts receivable balance for money owed Defendant for past purchases by Plaintiff.

After Defendants disclosed their rebuttal expert report,[19] Plaintiff served a supplemental expert witness report dated June 9, 2011.[20]  Vianello states that counsel for RMD "asked that I supplement my Expert Report with my observations regarding the Expert Report of [Defendants' Experts] dated April 26, 2011."  The supplemental report includes as an exhibit a report from Dr. Paul Koch, an associate of Vianello, who has not been designated as an expert witness in this case.  At Vianello's request, Koch analyzed the data in the rebuttal expert report and tested Vianello's theory by using the rebuttal experts' preferred ARIMA statistical tool in order to confirm the reasonableness of his opinion, resulting in less than $2500 difference in total damages.

## 1.    Supplemental Report

The Court will first address the admissibility of the supplemental report, as it impacts its ruling on Vianello's initial report.  Defendants ask the Court to determine whether the report, including Koch's report appended thereto, is a supplemental or rebuttal report and, if the latter, whether Fed. R. Civ. P. 37(c) sanctions are appropriate.

A party's expert witness is allowed to "supplement" his report under Rule 26(e)(1)(A) if the party learns that the report is "incomplete or incorrect, and if the additional corrective

---

[19]Doc. 327, Ex. 1.

[20]Doc. 321, Ex. 1.

information" has not yet been produced.[21]  Defendants argue that because the supplemental report makes no attempt to correct any misleading or false information, it is a rebuttal, and is untimely and improper.  Moreover, Defendants urge that RMD is trying to bolster Vianello's testimony with Koch's report, even though he has not been designated as an expert and will not be called to testify at trial.  Accordingly, Defendant argues that per Rule 37(c)(1), the Court should strike and exclude the untimely report and order RMD to pay Defendants' attorney's fees incurred from this motion.  That Rule states that when a party fails to comply with the timing requirements under Rule 26(a), then "the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless."[22]  The Tenth Circuit has held that four factors should guide the district court's discretion: 1) the prejudice or surprise to the party against whom the testimony is offered; 2) the ability of the party to cure the prejudice; 3) the extent to which introducing such testimony would disrupt the trial and 4) the moving party's bad faith or willfulness.[23]

The Court agrees with Defendants that the report is a rebuttal report.  Indeed, Vianello's opening line of the report stated the purpose is to respond with his observations regarding Defendants' expert report, and is organized by sub-headings that correspond to the numbered paragraphs in Defendants' expert report, critiquing it paragraph by paragraph.  As discussed below, however, the Court grants Plaintiff's Motion to strike the majority of Defendants' expert

---

[21]Fed. R. Civ. P. 26(e)(1)(A).

[22]Fed. R. Civ. P. 37(c)(1).

[23]*Woodworker's Supply, Inc. v. Principal Mut. Life Ins. Co.*, 170 F.3d 985, 993 (10th Cir. 1999).

rebuttal report,[24] making the majority of Defendants' request to strike the supplemental report moot. Dr. Koch will not be permitted to testify at trial, nor will Vianello be permitted to testify about the results of his test. As discussed below, however, the Court will consider Dr. Koch's report for the limited purpose of its *Daubert* analysis of whether Vianello's methodology in his initial report can be tested.

To the extent the rebuttal experts testify about Vianello's underlying facts and assumptions, however, the Court will allow him to offer rebuttal testimony. Such evidence, which is akin to that offered on redirect after cross-examination, presents no surprise or prejudice to Defendants, as Vianello has been deposed and there will be no disruption to trial.

### 2. Initial Report

### a. Impact of Court's Ruling on Termination of Agreement

Defendants urge the Court to strike Vianello's testimony in its entirety because he did not supplement or adjust his initial report to take into account the Court's ruling on termination of the Agreement, and thus his testimony cannot be helpful to a jury. The Agreement has two provisions relative to the Court's ruling that it expired on June 30, 2008 and the issue of damages: 1) the "exclusive distributorship" provisions under the initial term of the Agreement, which expired June 30, 2008; and 2) the "non-solicitation" provisions of the Agreement, which were in effect during the term of the Agreement and continued for five years after termination, expiring on June 30, 2013.[25] The exclusivity provision states that RMD will act as "exclusive distributor of the Exclusive Products in the Exclusive Market" and that Defendants "shall not

---

[24]*See supra* Section III.B at 20-22.

[25]*See* Doc. 278 at 7-8.

directly or indirectly sell the Exclusive Products in the Territory in the Exclusive Market and shall refer to RMD all inquiries received from customers or potential customers in the Territory regarding the same," and further, that Defendants will not "sell or distribute, directly or indirectly, the Exclusive Products to any entity or person (other than RMD) under circumstances where Permacel knows or has reason to believe that such sale will result in a breach of RMD's exclusive rights under this Agreement." The non-solicitation provision prohibits Defendants from soliciting "any customer or active prospective customer of RMD who/which was a customer of RMD at any time during the term of this Agreement."  Defendants argue that this provision has no bearing on Plaintiff's alleged damages because Plaintiff has no evidence that Defendants solicited any customer of RMD at any time during the term of the Agreement, and that none of Vianello's testimony or expert opinion as to damages is based on violations of the non-solicitation provision.  Instead, Vianello's report is based on the assumption "that the Distributorship Agreement remains viable into the indefinite future," and thus all of Plaintiff's damages for categories one, three and four are based on the exclusive distributorship provisions that stem from sales to Soundown and dB Acoustical, who were never customers of Plaintiff. Thus, Defendants argue, the cut-off date for Plaintiff's damages is the expiration of the Agreement, or June 30, 2008.

　　　While Defendants are correct that the ruling on termination impacts Vianello's report, it does not disqualify him from testifying under *Daubert*.  As Plaintiff points out, there are multiple ways to breach the Agreement, both during and after the initial term.  Vianello assumed a breach of the Agreement for purposes of making his damage calculation; he did not differentiate between a breach under the exclusivity provision or the non-solicitation provision.  Although the

11

Agreement terminated June 30, 2008, breach of the Agreement may continue for five years past that date under the non-solicitation clause.  Thus, the Court agrees with Plaintiff that the effect of its Order is to place an additional burden on it to prove to the jury whether there was a breach of the exclusivity provision, the non-solicitation provision, or both, either during the term of the Agreement or five years thereafter.  Defendants argue that there is no evidence of breach of the non-solicitation clause, which does not apply to dB Accoustical and Sundown because they were never customers of Plaintiff, who counters that those companies are clearly prospective customers that entered into sales relationships with Defendants during the term of the Agreement.  The Court previously denied the parties' cross-motions for summary judgment on the breach of contract claim and declines to revisit the issue in the context of a *Daubert* analysis. While it appears that Plaintiff's position is weak with respect to breach of the non-solicitation clause, that determination is left for trial.

Moreover, the Court agrees that Defendants' interpretation of the Court's ruling is that damages only occur with the actions causing the breach.  The Court's Order on termination does not prohibit Vianello from projecting future damages that are a result of the breaches that have already occurred during the exclusivity or non-solicitation time frame of the Agreement, which may persist beyond the date of the actual breach.  Thus, Defendants' argument that categories one through four should be reduced to the extent they include damages that occurred after June 30, 2008 is overruled at this time; and, although the damages from obsolescence in packaging occurred in 2009, they are consequential damages that would not be precluded because they were incurred after June 2008.

The greatest impact from the Court's ruling appears to be on Vianello's calculation of the

12

duration of damages projected into the future.  While the Court agrees that Vianello's projection

of future damages for seventy years is untenable given its ruling on termination, this does not

render his report inadmissible under *Daubert*.  Under Kansas law, "loss of profits resulting from

a breach of contract may be recovered as damages when such profits are proved with reasonable

certainty, and when they may reasonably be considered to have been within the contemplation of

the parties."[26]  The evidence necessary or sufficient to establish lost future profits with

reasonable certainty depends largely on the circumstances of the case.[27]  While absolute certainty

is not required, the factfinder must be guided by a rational standard.[28]

     In calculating the present value of Plaintiff's future damages, Vianello made

assumptions based on RMD's business records and testimony from McCarthy.  Vianello took

into consideration RMD's unknown equity value and thus discounted its future damages using

its estimated equity cost of capital, using a modified CAPM build-up method.[29]  When tested

with the ARIMA program, Vianello's projections proved to be precise.  Accordingly, the Court

finds that Vianello's calculations are based on facts that allow him to express a "reasonably

accurate" conclusion and not based on pure speculation.[30]

     In response to the Court's suggestion at oral argument that damages could not extend

beyond five years from the termination date, or June 2013, Plaintiff responded that Vianello's

---

[26]*CoreFirst Bank & Trust v. JHawker Capital, LLC*, 282 P.3d 618, 631 (Kan. Ct. App. 2012) (quoting *Vickers v. Wichita State Univ.*, 518 P.2d 512, [618] (Kan. 1974)).

[27]*Id.*

[28]*Olathe Mfg., Inc. v. Browning Mfg.*, 915 P.2d 86, 103-04 (Kan. 1996).

[29]Doc. 235, Ex. 1 at 11-12.

[30]*See Fisherman Surgical Instruments, LLC v. Tri-Anim Health Servs., Inc.*, 502 F. Supp. 2d 1170, 1186 (D. Kan. 2007) (excluding damages calculation based on an assumption for which "the record contains no evidence.").

testimony includes analysis of the residual effects caused by recapturing the market share of sales, which may extend beyond 2013.  As counsel pointed out at oral argument, this calculation assumes the whole world of potential breaches, and can be reduced accordingly depending on how the evidence comes in at trial.  In other words, although Vianello's assumption that the Agreement remains viable into the indefinite future is no longer valid, the report is structured so that the jury may cut off and reduce future damages at any point.  Accordingly, the Court's ruling on termination does not have a disqualifying impact on Vianello's calculations that cannot be adjusted as the evidence comes in at trial, with respect to the nature and timing of the breach, as well as any residual long-term effects.  Defendants' motion to strike on these grounds is overruled.[31]

  **b.**  **Diminished Sales Volumes**

  Although they do not contest Vianello's qualifications in accounting, Defendants argue that his calculations for damages categories three and four for diminished sales volume rely on statistical and economic analyses that are outside his expertise.  Alternatively, Defendants argue that even if he were qualified, the methodologies that Vianello relied upon are unreliable and were improperly applied.

  In reaching his lost sales volume calculation, Vianello assumed that RMD experienced a diminished volume of historical sales beyond the sales lost directly to the infringers Soundown and dB Acoustics.  Vianello based this assumption on testimony from McCarthy that RMD lost customers because Defendants violated the exclusivity provision of the Agreement by selling

---

[31]The Court strongly encourages Plaintiff to carefully consider how to structure the instructions and verdict forms or special interrogatories in a manner to guide the jury in its determination without undue burden or confusion.

Exclusive Products to RMD competitors who deal in the Exclusive Market within the Territory, citing as one example Design Engineering.  McCarthy also described the loss of a series of RMD customers in Southern California, New Mexico and Arizona in 2008.  According to McCarthy, RMD customers indicated that they purchased from competitor Second Skin, which was based in Phoenix, Arizona, in 2008, which received its Exclusive Product via dB Acoustical.  McCarthy also testified that in April 2008, Defendants required RMD to prepay for Exclusive Products.

Based on this information and events, Vianello opined that RMD experienced a diminished volume of  historical sales beyond the sales lost directly to the infringers, and that RMD will likely experience diminished future sales growth, attributable to 1) the prepayment requirement and 2) the sales growth that would have come by adding the infringers' customers to RMD's customer base, that is, the sales comprising category one damages.  To estimate these diminished sales, Vianello used a commercially available forecasting tool, Oracle's Crystal Ball Predictor ("Crystal Ball") and the Holt-Winters method available from the Crystal Ball package, a short-term moving average method used in production forecasting.  Crystal Ball is described as a spreadsheet-based application suite for predictive modeling, forecasting, simulation, and optimization.[32]  Vianello describes the software as being used to formulate trends based on historical data and allows the selection of a variety of accepted statistical trend methodologies to predict future sales, including the Holt-Winters additive method.[33]  Vianello chose the Holt-Winters "Additive Seasonal Smoothing" forecast model in this case, which produces exponentially smoothed values of the level of the forecast, the trend of the forecast, and the

---

[32]*See* http://www.oracle.com/us/products/middleware/bus-int/crystalball/index.html

[33] Doc. 319, Ex. 1 at 7 n.24.

15

seasonal adjustment to the forecast.[34]  According to Vianello, the Holt-Winters model is best for data with trend and seasonality that does not increase over time, meaning that it reflects the seasonal changes in the data without increasing the effects of seasonality over time.[35]

Vianello used the Holt-Winters methodology to forecast damages through 2010, then extrapolated Plaintiff's damages attributable to diminished future sales growth from June 2010 through 2080, or seventy years.  In doing so, Vianello assumed constant amounts of increasing sales and discounted the future values using its equity cost of capital, which he estimated to be 20.6%.

### *Vianello's Qualifications*

Defendants argue that instead of merely looking at historical data and calculating lost profits, Vianelllo attempts to use a combination of principles in econometrics and statistics generated by Crystal Ball, disciplines in which he is not qualified as an expert.  Despite their protests, Defendants argue, in effect, that only statisticians or econometricians are qualified to run automated forecasting on Crystal Ball as to future lost profits and that only regression analysis may be used.  The Court disagrees.

Vianello's accounting and business valuation experience qualify him to offer an opinion on future lost profits.  He has never held himself out as an expert in statistics, nor has he proffered an opinion in the area of statistics or econometrics.  Instead, Vianello used the Crystal Ball and Holt-Winter program to indirectly forecast sales to predict the need for inventory as a means to forecast lost profits, using assumptions based on standard accounting procedures.  The

---

[34]*Id.*

[35]*Id.*

fact that Holt-Winter is a statistics program does not mean Vianello was not qualified to use it in his calculations, as he essentially "plugged in" data to assist him in a process he would otherwise undertake as an accountant.  As Plaintiff points out, Defendants' argument is analogous to arguing Vianello is not qualified to use a computer because he cannot explain how a computer is programmed.  Accordingly, the Court finds that Vianello is qualified to render an opinion on Plaintiff's diminished historical and future sales.

### Reliability

Citing standards for statistical analysis in federal court, Defendants also challenge Vianello's opinion as unreliable, arguing that he improperly applied the statistical methodologies, that the Holt-Winters forecasting method cannot be tested for reliability and that he should have used ARIMA, a statistical tool that uses regression analysis.  Defendants' rebuttal experts opine that Vianello's report shows a "profound ignorance of regression analysis," and in their experience as statisticians, the method he selected has not been used to estimate damages in litigation.  Again, the Court disagrees.  Defendants' core disagreement appears to be Vianello's  failure to use what they consider to be the best methodology to arrive at his opinion. While the ARIMA program may be the preferred methodology by statisticians, Defendants present no evidence that Holt-Winters is not an acceptable methodology used by accountants in forecasting or why, in the context of forecasting sales and lost profits, a regression analysis was required in this case.  Indeed, proof to a statistical certainty is not the standard for recovery in a breach of contract action.[36]

---

[36]*See CoreFirst Bank & Trust v. JHawker Capital, LLC*, 282 P.2d 618, 631 (Kan. Ct. App. 2012) ("lost profits resulting from a breach of contract may be recovered as damages when such profits are proved with reasonable certainty, and when they may reasonably be considered to have been within the contemplation of the parties."); *Rinehart v. Morton Bldgs., Inc.*, 240 P.3d 626, at *7 (Table) (Kan. Ct. App. 2010) (stating general

Likewise, while Defendants urge that Holt-Winters is not subject to testing from a statistician's point of view, there is no evidence that it is not subject to testing in the field of accounting.  In response to Defendants' rebuttal report, Vianello tested the reasonableness of his methodology by comparing it with the ARIMA statistical tool.  Vianello had his associate, Dr. Koch, use the ARIMA methodology on the same basis and with the same assumptions that were used in the Holt-Winters analysis, producing a difference of $2500.  Given that Vianello projected lost sales out for seventy years, this difference would be even less in the likely event that projection is reduced to a shorter time frame.  Thus, the Court finds that the Holt-Winter methodology can be tested by using other statistical methods.  In so ruling, the Court stresses that Dr. Koch will not be a witness at trial and Plaintiff may not use his test results to otherwise bolster or support Vianello's initial opinion on lost profits damages.

Moreover, while Defendants argue that Holt-Winters is not accepted in the statistical or economic community as a valid regression analysis, Plaintiffs have offered evidence that Holt-Winters has been an accepted model for predicting future sales for over fifty years.[37]  While Vianello did project damages seventy years into the future, he used the Holt-Winters methodology to forecast damages only through 2010, a relatively short period of time; after that, he assumed constant amounts of increasing sales for purposes of his damage analysis, which Defendants characterize as "basic arithmetic."

Defendants also challenge most, if not all, of the underlying assumptions, facts and data

---

measure of damages for breach of contract as "such sum as [the jury] believe[s] will fairly and justly compensate the plaintiff for the damages you believe he sustained as a direct result of the breach of contract by defendant.") (citing PIK Civ. 4th  124.16).

[37]Hrg. Ex. 6.

upon which Vianello based his calculations and opinion.[38]  "[T]he factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination."[39]  Such challenges include but are not limited to the choices Vianello made with respect to his methodology and calculations formulas, assumptions about market shares, pricing discounts and pricing favoritism, the impact of prepayment requirements, and the impact of customer return rates. These challenges go to weight not admissibility, and are proper subjects for cross-examination.

 **c.**  **Causation**

   Defendants further contend that Vianello's methodology is flawed because he based his opinions on assumptions of the very conclusions his testimony is intended to prove. Specifically, Defendants contend that Vianello assumed that had the alleged wrongful sales not been made, Plaintiff would have sold the same quantity of product at Plaintiff's higher price to the new customers.

   Vianello is not a causation expert.  His expert testimony relates only to damage calculation, not to causation.  Because this is a contract case, breach of the contract is the causation for purposes of Vianello's damages calculations—in other words, to recover lost profits, a plaintiff must show that "but for" the alleged infringing sales, plaintiff would have sold the product.  Vianello assumed causation based on the evidence that was presented to him by Plaintiff.  For purposes of presenting his damage calculation methods, however, Vianello is

---

[38]The Court notes that most of these challenges are presented in a multitude of "uncontroverted facts" consisting of highly parsed portions of deposition testimony.

[39]*Paradigm Alliance, Inc. v. Celeritas Techs., LLC*, No. 07-1121-EFM, 2009 WL 3855677, at *3 (D. Kan. Nov. 17, 2009).

permitted to presume causation, which is a prerequisite to recovery that will have to be established at trial by evidence other than Vianello's testimony.[40]  The issue of whether a breach occurred is clearly an element of Plaintiff's case, which Plaintiff readily accepts the burden of proof at trial.  Vianello may show that his calculations are consistent with Plaintiff's theory of causation, and thus Defendants' objection is overruled.

  d.     **Damage Categories One and Two**

 Defendants further challenge two categories of Vianello's damage calculations as unreliable.  First, Defendants challenge the calculation for infringing sales in category one, arguing that Vianello did not take into consideration the fact that Soundown and dB Acoustical would have qualified as a distributor or master distributer, and thus given a thirty or forty percent discount.  Because Vianello overstated the damages, Defendants argue, his opinion fails to meet the reliability requirement of Rule 702.  Plaintiff responds that the decision to give a discount rate is RMD's choice, which was taken away when Defendants breached their obligations under the agreement.  Defendants' arguments go to the weight and not the admissibility of Vianello's opinion, and they are free to cross-examine Vianello and McCarthy on the discount point.

  With respect to the "most favored nation pricing" calculation in category two, Vianello concluded that the average price per pound occasionally exceeded the price charged to Soundown or dB Acoustical for a given product, and thus violated the Agreement, resulting in overcharges of $84,754.  Defendants' rebuttal experts contend that Vianello failed to consider product characteristics or quantities sold, and that his analysis ignores the difference in the

---

[40]*See CRST Van Expedited, Inc.v. J.B. Hunt Transport, Inc.*, Case No. CIV-04-0651-F, 2006 WL 2054646, at *4 (W.D. Okla. July 24, 2006) (holding damages expert is entitled to show his calculations are consistent with plaintiff's theory of causation).

product backing and computes a fluctuating average price per pound due to a changing product mix when product pricing was unchanged.  Again, Defendants' arguments go to the weight and not the admissibility of Vianello's opinion, and they are free to cross-examine him on this point. Moreover, as discussed below, Defendants' rebuttal experts are permitted to offer testimony on the pricing issue.

### B.      Drs. Pflaum and McCollister

Defendants did not designate a primary expert of their own, but instead designated Dr. Christopher Pflaum and Dr. George McCollister of Spectrum Economics as rebuttal experts. Both Pflaum and McCollister are experts in econometrics, a highly technical specialty within the larger field of statistics.  Their report dated April 26, 2011, challenges both Vianello's methodology and his assumptions regarding causation.[41]

"The proper function of rebuttal evidence is to contradict, impeach or defuse the impact of the evidence offered by an adverse party."[42]  Rebuttal expert testimony must address the "same subject matter" identified by the initial expert.[43]  In other words, a rebuttal expert report is not the proper place for presenting new arguments.[44]  The Court concludes that  Drs. Pflaum and McCollister's report goes beyond the scope of a proper rebuttal witness.

First, the rebuttal experts question Vianello's qualifications and argue that his methodology does not meet the requirements of *Daubert*, taking exception to his use of Crystal

---

[41]Doc. 327, Ex. 1.

[42]*Peals v. Terre Haute Police Dept.*, 535 F.3d 621, 630 (7th Cir. 2008) (citation omitted).

[43]Fed. R. Civ. P. 26(a)(2)(C)(ii).

[44]*1-800 Contacts, Inc. v. Lens.com,* Inc., 755 F. Supp. 2d 1151, 1167 (D. Utah 2010); *LaFlamme v. Safeway, Inc.*, Case No. 09-cv-00514-ECR, 2010 WL 3522378, at *2 (D. Nev. Sept. 2, 2010) (quotations omitted).

Ball generally and Holt-Winters specifically because it is not a regression analysis, it cannot be tested for significance of the measure of association, has no known error rate and has never been used to estimate damages in litigation.   The admissibility of Vianello's expert testimony is an issue of law in the gatekeeper province of this Court, which has determined that his opinion passes *Daubert* muster, both in terms of his qualification as an expert in accounting and the reliability of his methodology.   Accordingly, the Court strikes the rebuttal report to the extent it opines on the admissibility of Vianello's report under *Daubert*.

Second, neither Pflaum nor McCollister proffers an opinion to rebut Vianello's accounting methodology or opinion.  Although both are experts in econometrics, neither offers a rebuttal opinion as to the actual damages suffered by Plaintiff, but only that they did not believe Plaintiff's damages were "statistically significant."  The rebuttal experts opine that Vianello should have used the ARIMA statistical tool instead of Holt-Winters, and when they performed regressions based on the same claimed actions of Defendants, the results were not statistically significant in relation to Plaintiff's sales—in other words, there is no evidence of causation. However, Vianello is clearly not offered as an expert on causation, as he makes the assumption that a breach or breaches of contract had occurred in formulating his damage calculations.  The purpose of a rebuttal opinion is just that—to rebut evidence offered by the adverse party.  In this case, Defendants' experts cannot be considered rebuttal experts on the issue of causation because their purpose is to contradict an anticipated portion of Plaintiff's case in chief.[45]  Defendant seeks to introduce rebuttal testimony to question the existence of a key element of Plaintiff's

---

[45]*Id.* at *3 (citing *Morgan v. Comm. Union Assurance Cos.*, 606 F.2d 554, 555 (5th Cir. 1979)); *Amos v. Makita U.S.A.*, Case No. 09-cv-01304-GMN, 2011 WL 43092, at *2 (D. Nev. Jan. 3, 2011) (citing *In re Apex Oil Co.*, 958 F.2d 243, 245 (8th Cir. 1992)).

case—whether or not Defendants breached the Agreement, resulting in damages to Plaintiff. Thus, Plaintiffs are correct that Defendants' witnesses impermissibly seek to introduce new testimony and opinions on causation.  Accordingly, the Court will strike the rebuttal report to the extent it opines that Vianello should have used the ARIMA methodology and the results of Pflaum and McCollister's tests using that report.

That said, some parts of Pflaum and McCollister's report can fairly be deemed as responding to/rebutting the conclusions of Vianello.  Pflaum and McCollister reviewed and critiqued Vianello's report, challenging the evidence and assumptions upon which he relied. Specifically, the rebuttal experts challenge Vianello's claim of loss due to Defendants' prepayment requirements,[46] and his "most favored nation pricing" in category two.[47] In situations like this, the appropriate course is to limit the proposed rebuttal expert's testimony rather than striking it altogether.[48]  Accordingly, the testimony of Dr. Pflaum and Dr. McCollister as rebuttal witnesses is limited to their critique of Vianello's opinion as set forth above.

IT IS THEREFORE ORDERED BY THE COURT that Defendants' Motion to Strike Plaintiff's Expert Marc Vianello (Doc. 318) is DENIED; Defendants' Motion to Strike and Exclude the Supplemental Report (Doc. 320) is GRANTED in part and DENIED in part;

IT IS FURTHER ORDERED that Plaintiff's Motion to Strike and Exclude the Testimony and Opinions of Dr. Pflaum and Dr. McCollister (Doc. 326) is GRANTED in part and

---

[46]*Id.* at 18-20.

[47]*Id*. at 21-23.

[48]*See, e.g., Noffsinger v. The Valspar Corp.*, Case No. 09 C 916, 2011 WL 9795, at *7 (N.D. Ill. Jan. 3, 2011) (citing cases).

DENIED in part.

**IT IS FURTHER ORDERED** that Plaintiff's Motion to Strike (Doc. 343) is DENIED and Defendants' Motion to Exceed Page Limit (Doc. 353) is GRANTED.

**IT IS SO ORDERED.**

Dated: November 5, 2012

                                        S/ Julie A. Robinson

                                    JULIE A. ROBINSON

                                    UNITED STATES DISTRICT JUDGE